# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| JENNIFER LYNN DILLARD, | CASE NO. 3:23-CV-00619-JJH |
| Plaintiff, | JUDGE JEFFREY J. HELMICK |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Jennifer Dillard challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 23, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Mar. 23, 2023). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

## PROCEDURAL BACKGROUND

Ms. Dillard filed for DIB and SSI on January 28, 2021, alleging a disability onset date of October 29, 2019 in her SSI application and April 3, 2018 in her DIB application. (Tr. 246, 253). The claims were denied initially and on reconsideration. (Tr. 80-101, 104-27). Ms. Dillard then

requested a hearing before an Administrative Law Judge. (Tr. 105-06). Ms. Dillard (represented by counsel) and a vocational expert (VE) testified before the ALJ on February 10, 2022. (Tr. 42-75).

On March 2, 2022, the ALJ issued a written decision finding Ms. Dillard not disabled. (Tr. 17-34). The Appeals Council denied Ms. Dillard's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Dillard timely filed this action on March 22, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Dillard was 36 years old on the alleged onset date, making her a younger individual under the relevant regulations. (Tr. 32). She completed high school and has worked as a cashier, server, sales clerk, and fast food worker. (Tr. 32-33).

## II.    RELEVANT MEDICAL EVIDENCE

On April 6, 2018, Ms. Dillard presented to the emergency room after passing out while driving three days prior. (Tr. 387). She denied biting her tongue or experiencing incontinence but was confused for 20 minutes after the episode. (Tr. 387-88). She ate something and felt better after, so she continued driving that day. (Tr. 387). However, she had generalized weakness and headache since the episode. (*Id.*). She reported falling asleep while talking to people and falling asleep one other time while driving. (Tr. 388). She had stopped Adipex four days prior to the incident. (*Id.*). After examination, she was assessed with syncope, narcolepsy, morbid obesity, and migraine with aura. (Tr. 391-92). She was recommended to complete an echocardiogram and a polysomnogram with CPAP; stay off Adipex; and continue her current medications. (*Id.*).

Ms. Dillard began treating with neurologist Adam Kapler, D.O. at Advanced Neurologic Associates, Inc., on April 11, 2018, for evaluation of passing out while driving. (Tr. 535, 537). Ms. Dillard reported feeling lightheaded, boggy, confused, presyncopal, and getting obscured vision. (Tr. 537). She reported typically getting only a few headaches per month, but that since the event, she had been getting daily headaches that felt like a hammer beating her in the head and hurting all over. (*Id.*). Dr. Kapler discontinued Fioricet, and daily naproxen usage, started Ms. Dillard on over-the-counter iron supplements, restricted her from driving, but placed no work restrictions. (*Id.*). An April 12, 2018 transthoracic echocardiogram indicated normal systolic function and no significant valvular disease. (Tr. 492-94).

At a May 4, 2018 visit with Dr. Kapler, Ms. Dillard reported continued symptoms and dizziness all the time. (Tr. 1606). She described seeing spots and spinning vertigo when she stands up. (*Id.*). She gets presyncopal every time she takes a shower. (*Id.*). She described her continued headaches as "horrific." (*Id.*). Dr. Kapler made a referral for vestibular physical therapy, discontinued topiramate, relaxed driving restrictions, and imposed no work restrictions. (*Id.*).

Ms. Dillard also attended physical therapy with Lisa Myatt, PT, for her complaints of syncope and dizziness in May and June of 2018. (Tr. 888-91, 1648-56, 1665-78). She reported having a 7/10 headache at her first session, but no dizziness. (Tr. 888). She reported 70% improvement with intervention and was independent with her home exercise program and was discharged from physical therapy on June 13, 2018. (Tr. 891). She restarted physical therapy on December 3, 2019. (Tr. 1772-86). By her seventh visit on December 26, 2019, she had met all goals for physical therapy and was independent on her home exercise program and was discharged. (Tr. 1783-86).

Ms. Dillard followed up with Dr. Kapler on June 1, 2018. (Tr. 1600). She reported having a few more episodes since her last visit, including while exiting the car and showering. (Tr. 1602). MRI completed on April 13, 2018 was unremarkable. (*Id.*). Dr. Kapler removed Ms. Dillard's driving restrictions. (*Id.*).

On June 14, 2018, Ms. Dillard established care with cardiologist Jeffrey Hershey, M.D. (Tr. 504). Dr. Hershey's notes indicated that neurology workups were negative. (*Id.*). Ms. Dillard reported dizziness and syncope, with dizziness when she gets headaches. (*Id.*). She would also get dizzy when looking to the left. (*Id.*).

Ms. Dillard underwent a functional capacity examination on June 21, 2018 with Melinda DePolo, PT. (Tr. 519-25). At the time, she was diagnosed with syncope and seizures. (Tr. 519). Ms. Dillard completed positional tolerance, mobility, lifting, push-pull, and carry tests. (Tr. 522-25). She reported increased dizziness during testing. (*Id.*). She could return to work as a cashier and sales desk associate, but was recommended to avoid performing fast motions, especially with stooping, pushing/pulling, and twisting/turning head to the left, due to dizziness. (Tr. 525).

Tilt table tests from July 11, 2018, indicated an abnormal blood pressure response to tilt, with blood pressure changes consistent with postural hypotension, but not overly indicative of postural orthostatic tachycardia syndrome (POTS). (Tr. 505). At a follow up on July 27, 2018, Ms. Dillard reported that her syncopal episodes began in April and she had been taking Buspar for two years; Dr. Hershey indicated that Buspar has a side effect of dizziness and neurologic issues. (*Id.*). On August 28, 2018, Ms. Dillard reported continued episodes of dizziness and near syncope, with lightheadedness upon standing. (Tr. 505). She stopped Buspar with no changes in dizziness or

lightheadedness. (*Id.*). She was evaluated for chest discomfort in the emergency department, but EKG and troponin levels were unremarkable and she was discharged to home. (*Id.*).

On July 31, 2018, Ms. Dillard had an x-ray of her lumbar spine, which revealed minimal spondylolisthesis of L5 on S1. (Tr. 490).

On October 8, 2018, Ms. Dillard returned for follow up with Dr. Hershey. (*Id.*). She reported feeling somewhat better, with fewer incidences of dizziness and syncope. (*Id.*). She also reported difficulty at work due to standing; when she feels dizzy, she sits and elevates her legs. (*Id.*). She believed that increasing her salt intake and wearing compression hose had improved her symptoms. (*Id.*). Dr. Hershey diagnosed Ms. Dillard with syncope, vertigo, postural hypotension, and obesity class III. (Tr. 507). He recommended Ms. Dillard stay hydrated, continue increased salt intake and compression stockings, and begin increasing aerobic activity slowly. (*Id.*). If she has warning symptoms, she should sit or lie down and elevate her lower extremities. (*Id.*).

On January 16, 2019, Ms. Dillard presented for a three month follow up with Dr. Hershey, where she reported two episodes since her last visit but her symptoms had improved with salt intake and compression stockings, as well as using her CPAP machine. (Tr. 544). At a six-month follow up on July 19, 2019, Ms. Dillard reported continued dizziness but no syncopal episodes. (*Id.*).

On January 31, 2019, Ms. Dillard reported to Dr. Kapler that her migraines had increased to two or three per week, lasting for a full day if not longer. (Tr. 1591). Excedrin was not helpful, and she needed to visit the ER due to severe pain; she sometimes had nausea. (*Id.*). Dr. Kapler had low suspicion of any sort of seizure disorder. (*Id.*). He restarted Ms. Dillard on ropinirole, recommended an iron supplement, and started topiramate 25 mg daily increasing to 50 mg. (*Id.*).

On May 29, 2019, Ms. Dillard again treated with neurologist Dr. Kapler. (Tr. 1585). He indicated she was seen on July 26, 2018 and January 31, 2019 for near syncope and dizziness. (Tr. 1585, 1589). She complained of more dizzy episodes with frequent numbness and tingling in her fingers and toes. (Tr. 1586). She also complained of daily headaches. (*Id.*). Previous MRI from April 13, 2018 was unremarkable. (*Id.*). Dr. Kapler assessed Ms. Dillard with recurrent presyncope and dysautonomia, chronic vestibular syndrome, and chronic migraine without aura occurring more than half of the days per month and more than four hours at a time. (*Id.*). He started her on Aimovig injections and ropinirole. (Tr. 1580).

On July 22, 2019, Ms. Dillard presented to the emergency department and reported feeling lightheaded with headache the past 1.5 hours. (Tr. 652). She reported no syncopal episodes that day but had three episodes two days prior. (*Id.*). She was assessed with headache and weakness with dizziness and given a prescription for Reglan to use as needed. (Tr. 653). She was discharged with a work note for that day and the next. (*Id.*).

Ms. Dillard followed up with her primary care physician, Scott Kaple, D.O., on July 23, 2019. (Tr. 1061). She reported having a headache but otherwise felt fine the day she went to the emergency department for a syncopal episode. (Tr. 1062). Dr. Kaple provided her with a disability placard and compression hose for her syncope and orthostatic hypotension diagnoses, as well as a shower chair. (Tr. 1063, 1067).

On her August 2, 2019 visit with Dr. Kapler, Ms. Dillard was doing well on Aimovig and had only had two headaches since her July 23rd visit. (Tr. 1582). She reported having about 22 headaches in the month without her Aimovig injection. (*Id.*). She reported having a dull, achy headache lasting for five or six hours the day before, even with Aimovig. (*Id.*). The pain would vary

in location on her head. (*Id.*). She reported lightheaded spells happening at least a couple of times a week, and the numbness in her fingers and toes had resolved. (*Id.*). Dr. Kapler indicated her chronic migraine without aura drastically improved on Aimovig and he would continue to try to get the prescription approved. (*Id.*). She requested a prescription for an electric scooter or rolling walker and complained she was not active due to her presycopal issues and fear of passing out. (*Id.*). Dr. Kapler declined to provide this prescription out of concern that it would contribute to her general debility and inactivity, but he did provide a referral for weight loss surgery. (*Id.*).

Ms. Dillard again presented to the emergency department on October 2, 2019, complaining of dizziness and worsening vertigo symptoms. (Tr. 662). Notes indicated she was diagnosed with chronic vertigo and had treated with cardiology and neurology on a regular basis. (*Id.*). She had been through vertigo rehabilitation with mild relief. (*Id*) Her symptoms were not reproducible on examination, but she appeared to have worsening postural vertigo. (Tr. 663). She was given a prescription for meclizine and discharged. (*Id.*).

Ms. Dillard presented to the emergency department on November 14, 2019 complaining of persistent dizziness for three days with two syncopal episodes. (Tr. 671). She was 12 weeks pregnant. (*Id.*). She reported seeing her neurologist recently who had prescribed magnesium for headaches. (*Id.*). Bloodwork revealed hypokalemia and testing revealed positional vertigo. (Tr. 672). She was given meclizine and IV Zofran and discharged with recommendation to follow up with her neurologist. (*Id.*).

Ms. Dillard treated with Dr. Kapler on July 21, 2020, who diagnosed her with migraine, dizziness, restless leg syndrome, and near-syncope. (Tr. 1567). He started her on ropinirole and restarted Aimovig injections. (*Id.*).

During visits with Dr. Scott Kaple on August 28 and September 8, 2020, Ms. Dillard reported her POTS and near syncope were worsening; she often feels dizzy and has frequent headaches, almost every day. (Tr. 1074,1078). Dr. Kaple indicated at these visits and again on November 30, 2020 that her POTS and migraines were under good control with Aimovig. (Tr. 1076, 1080, 1088). She could walk a mile, pick up her 17-pound son, and move boxes from the house to the garage. (Tr. 1086-87). She denied lightheadedness. (Tr. 1087).

At follow up on September 23, 2020, Dr. Kapler started Ms. Dillard on topiramate, increased ropinirole, and continued Aimovig injections. (Tr. 719, 1567-68). Ms. Dillard reported Aimovig injections had been very beneficial prior to her pregnancy but were less effective after restarting. (Tr. 1567). Dr. Kapler assessed her with migraine without aura happening more than fifteen days per month. (*Id.*). He indicated her dizziness may be related to vestibular migraine and assessed her with persistent and recurrent presyncope and dysautonomia. (*Id.*).

At follow up on October 27, 2020, Ms. Dillard reported her migraines improved and were occurring less frequently, but she still had bad days with dizziness where she could not get out of bed. (Tr. 719). Dr. Kapler assessed Ms. Dillard with migraine without aura, happening 15 days per month. (Tr. 720). She previously benefited from Aimovig but stopped because she was pregnant. (*Id.*). He also diagnosed persistent but mild vertigo, not completely amenable to vestibular physical therapy; may be vestibular migraine. (*Id.*). Dr. Kapler continued topiramate, ropinirole, Fioricet, fludrocortisone, and Aimovig but increased to 140 mg monthly. (*Id.*). He recommended considering gabapentin for help with headaches and restless leg syndrome. (*Id.*).

Ms. Dillard underwent a second functional capacity exam with Ms. DePolo on November 2, 2020. (Tr. 699-718). During this examination, she was diagnosed with restless leg syndrome,

dizziness, and dysautonomia. (Tr. 699). She reported often feeling dizzy and weak, cannot make

sudden movements, and has headaches nearly every day. (*Id.*). She reported she was let go from

Subway in December 2019 due to dizziness affecting her work. (Tr. 701). Range of motion tests in

her cervical spine caused increased dizziness, although otherwise were within normal limits. (Tr.

702). Ms. DePolo recommended Ms. Dillard receive dietary counseling to prepare for possible

bariatric surgery because syncope and vertigo limit her exercise tolerance. (Tr. 718). Her myriad

medical conditions, including kidney issues, low back pain, vertigo, syncope, asthma, and POTS,

limit her from seeking employment. (*Id.*).

On January 19, 2021, Ms. Dillard treated with Dr. Kapler. (Tr. 2838). She reported her

migraines had been lasting longer because she could not take Excedrin Migraine due to

interactions with her blood thinner injections. (*Id.*). Dr. Kapler assessed Ms. Dillard with migraine

without aura, happening 15+ days per month. (Tr. 2839). He indicated it may be sinus related and

prescribed fluticasone. (*Id.*). On March 18, 2021, she reported the fluticasone had been helpful for

her migraines. (Tr. 2835).

On March 24, 2021, Ms. Dillard presented to Dr. Hershey for cardiac clearance in advance

of bariatric surgery. (Tr. 2909). She had fallen and broke her fibula, fractured two bones, and

dislocated her ankle, and had surgical repair. (*Id.*; *see also* Tr. 2159, 2168-72). She reported one

episode of near syncope, which her neurologist attributed to stress. (*Id.*). Dr. Hershey found her at

low risk for a perioperative cardiovascular event and completed her clearance form. (Tr. 2911).

On June 8, 2021, Ms. Dillard underwent bariatric surgery. (Tr. 3047-48). Post-op, she had

an episode of passing out. (Tr. 3049). She reported getting up to use the bathroom, felt dizzy, had

tunnel vision, and passed out. (Tr. 3071). She passed out ten minutes later while sitting on the side of the bed; it took her 20 minutes to come around. (*Id.*).

At follow up with Dr. Hershey on July 1, 2021, Ms. Dillard reported she was experiencing increased syncopal episodes post-surgery. (Tr. 3077). Dr. Hershey noted Ms. Dillard's neurologist had started her on Florinef, but preferred she not use it if possible secondary to potential side effects. (Tr. 3077, 3080).

At her six-month follow up from bariatric surgery with Dr. Kaple on July 26, 2021, Ms. Dillard reported worsening POTS and not driving for safety reasons. (Tr. 3189). She had not returned to physical therapy for her ankle that she had previously fractured because of the increase in POTS-related symptoms. (Tr. 3190). Dr. Kaple indicated the increase in POTS symptomology was to be expected. (Tr. 3191).

On August 25, 2021, Ms. Dillard presented to the POTS clinic at the University of Toledo and treated with Beverly Karabin, APRN, Ph.D., NP. (Tr. 3101-02). She reported blacking out while driving three years prior and being bedridden for six weeks due to extreme orthostatic intolerance. (Tr. 3101). Dr. Karabin confirmed that orthostatic intolerance consistent with POTS could worsen after bariatric surgery. (*Id.*). She discussed with Ms. Dillard the avoidance of triggers, the importance of fluids, compression, and sodium, and added pyridostigmine to help her heart rate and blood pressure stabilization. (*Id.*). Ms. Dillard's lightheadedness worsened with activity, position changes, bending forward, and decreased water intake, and relieved with supine position, sitting, and fluids. (Tr. 3103). Associated symptoms included palpitations, diaphoresis, tunnel vision, weakness, fatigue, headache, chest pain, and dyspnea. (*Id.*).

At a visit with Chloe Callison, PA-C, on November 24, 2021, Ms. Dillard denied any syncopal events since her last appointment, but stated that dizziness came and went. (Tr. 3152). Her headaches had increased in both frequency and intensity. (*Id.*). PA-C Callison assessed Ms. Dillard with migraine without aura, initially happening 15+ days per month, now having a few non-severe days per month, but had worsened. (*Id.*). She benefited from Aimovig. (*Id.*). Dizziness was worse in the setting of worsened orthostatic hypotension. (*Id.*). PA-C Callison continued topiramate, ropinirole, and Aimovig, and trialed Ubrelvy for breakthrough migraines and Floricet sparingly. (Tr. 3153).

On January 17, 2022, Ms. Dillard met with PA-C Callison and reported getting lightheaded and dizzy with imbalance after standing for longer periods. (Tr. 3243). Her headaches had been worsening, especially morning frontal headaches. (*Id.*). PA-C Callison surmised this may be due to Ms. Dillard's inability to use her CPAP because it had been recalled. (*Id.*). She was not on any cardiac medications due to side effects when on pyridostigmine. (*Id.*). Her persistent and recurrent presyncope and dysautonomia had worsened after her bariatric surgery; she had syncopized. (Tr. 3244). She had not been taking fludrocortisone and did not tolerate pyridostigmine; however, PA-C Callison indicated she needed to follow up with the POTS clinic before returning to neurology because her symptomology may be related to syncopal events. (*Id.*).

## III. MEDICAL OPINIONS

Ms. Dillard treated with chiropractor Thomas Andosca, D.C., for her bilateral spondylosis, anterolisthesis of L5 on S1, and anterior slippage of L5. (Tr. 2140; *see also* Tr. 2141-54, 2298-314, 3015-17, 3104-07, 3245-47). On October 16, 2020, Dr. Andosca opined that Ms. Dillard should not lift more than 10 pounds, never climb due to dizzy spells, never lift from floor to waist, never

twist, could only stand for 30 minutes at one time, and never sit more than two hours at one time, and that she must change positions frequently. (Tr. 727). He also noted her ability to sit or squat was limited. (*Id.*). Dr. Andosca stated that, in his opinion, Ms. Dillard should be considered totally disabled from performing gainful employment. (*Id.*).

On January 24, 2022, Dr. Andosca submitted a second letter indicating Ms. Dillard would have short-term relief for a day or two after treatment but that her pain would return and prevent her from most lifting and twisting activities. (Tr. 3245). He also indicated he had witnessed Ms. Dillard's POTS and syncope symptoms while she was in treatment at his office. (*Id.*).

On April 17, 2021, state agency physician James Caccillo, M.D., reviewed Ms. Dillard's records and opined that she would be limited to occasionally lifting and carrying 20 pounds, frequently 10 pounds, and could tolerate four hours standing and walking, and sitting about six hours in an eight-hour workday. (Tr. 86-88, 97-99). She should avoid all exposure to unprotected heights and hazardous machinery, no commercial driving. (Tr. 87). Because of her history of asthma, she should avoid concentrated exposure to fumes and other irritants. (*Id.*).

Agency reviewer Karla Delcour, Ph.D., opined Ms. Dillard would be moderately limited with the ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule and maintain regular attendance and be punctual within customary tolerances, ability to sustain an ordinary routine without special supervision, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, ability to respond appropriately to changes in the work setting, ability to be aware of

12

normal hazards and take appropriate precautions, ability to travel in unfamiliar places or use public transportation, and ability to set realistic goals or make plans independently of others. (Tr. 88-89, 99-100). She could work within a set routine in the workplace with time to adjust to new expectations; she had reduced ability to handle routine stress but could adequately handle tasks without strict time limitations or production standards. (Tr. 89).

At the reconsideration level on August 23, 2021, Gerald Klyop, M.D., found the medical evidence supported the prior administrative findings, as did Irma Johnston, Psy.D. (Tr. 112-15).

## IV.  ADMINISTRATIVE HEARING

On March 2, 2022, Ms. Dillard testified she had last worked in December 2019. (Tr. 50). Previously, she had worked three hours a day at Subway. (*Id.*). She had also worked as a retail cashier but stopped in March 2018 after taking medical leave. (Tr. 51). In that position, she was required to lift up to 25 pounds and stand for the entire shift. (Tr. 52-53). She had also worked at a café making hot dogs, pizzas, and salads; she was required to stand and lift up to 50 pounds. (Tr. 53-54).

Ms. Dillard lives in a duplex apartment with her fiancé and two children, ages 9 years and 20 months. (Tr. 55-56). She has someone with her in the home 24/7 to help take care of the 20-month-old. (Tr. 57-58). She has problems going up and down the stairs in her apartment, so she is sleeping downstairs in the living room until they can find a one-floor dwelling. (Tr. 56). Ms. Dillard has no driving restrictions but has not driven since 2019; she gets rides from her fiancé, parents, or friends. (Tr. 55). She has a handicap placard. (Tr. 65). She can only complete chores if seated. (Tr. 57). She can only go to the grocery store if there is an electric cart for her to use. (Tr. 63). She does not often leave her home. (Tr. 67).

13

Ms. Dillard testified to having extreme dizziness spells for the previous four months. (Tr. 56). Her episodes start with black spots, progress to tunnel vision, and then she loses consciousness. (Tr. 58-59). She last had an episode just before her gastric bypass surgery. (Tr. 59). When she has these episodes, her fiancé will catch her and help her to focus until she can "get out of it"; she cannot recover on her own. (*Id.*). Triggers include heat, bending over, and sudden movements. (Tr. 65). She began treatment at a POTS clinic the previous October. (Tr. 56). While in treatment there she had trialed and failed at least two medications due to side effects; one caused hives and the other caused low blood pressure. (Tr. 56-57). The POTS clinic had not started her on physical therapy for her vertigo, but she had done physical therapy for her back. (Tr. 57). She uses a walker when she feels dizzy. (Tr. 65-66). She previously used a cane but now needs to use a walker more frequently for balance. (Tr. 66). She needs to elevate her legs often to relieve her POTS. (*Id.*).

Ms. Dillard is five foot four inches and was previously over 300 pounds; post gastric bypass surgery she weighs 194 pounds. (Tr. 59-60).

Ms. Dillard experienced severe migraines that required her to visit the hospital two or three times per month for shots. (Tr. 60). While she now has medications that help the severity of the headaches, they still occur daily. (*Id.*). She takes three medications: a monthly shot, daily maintenance, and a medication to take at the onset of a migraine. (Tr. 61). She also has been waking up with migraines; her doctors believe it may be related to needing a CPAP machine. (Tr. 61). She has been having insurance issues in obtaining the CPAP machine and at the time of the hearing she could not use it. (*Id.*).

14

She had surgery on her right ankle with wiring; since she lost weight, the wires have become irritating and painful. (Tr. 62). She does not have problems standing on it, per se, but it will ache if she is on it for a long time or if it rains. (*Id.*). She also has spondylosis in her back that causes excruciating pain, particularly with weather changes. (Tr. 66). She uses a heating pad and receives chiropractic care for relief. (*Id.*).

Ms. Dillard also has issues with anxiety and depression. (Tr. 63). She experiences a lot of anxiety attacks and nighttime tearful episodes. (*Id.*). She sometimes feels overwhelmed at the store and returns to the car. (*Id.*). She will watch cartoons and read with her children but finds some of the cartoons hard to follow. (Tr. 64).

The VE classified Ms. Dillard's past work as cashier, light; and fast-food worker, light, but medium as performed. (Tr. 69-70). She testified that a hypothetical individual with the limitations described in the RFC could perform less than sedentary work as a final assembler, a circuit board assembler, and document preparer. (Tr. 70-72). Employers typically require an employee be on task 85% of the day and tolerate one or two absences per month during a probationary period but that even one absence per month would likely be work preclusive after the probationary period is over. (Tr. 72-73).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

15

The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

On March 2, 2022, the ALJ issued an unfavorable decision. (Tr. 17-34). At Step One, the ALJ determined Ms. Dillard had not engaged in substantial gainful activity since April 3, 2018, her alleged onset date. (Tr. 20). At Step Two, the ALJ identified the following severe impairments: obesity, status-post June 2021 gastric bypass; postural hypotension/POTS; migraine; lumbar

degenerative disc disease with anterolisthesis of L5 on S1; bilateral knee osteoarthritis; status-post right fibula and ankle medial malleolus fracture and syndesmosis with open reduction and internal fixation (ORIF); major depressive disorder; and anxiety disorder. (*Id.*). The ALJ determined Ms. Dillard's asthma, obstructive sleep apnea, bronchitis, and narcolepsy were not severe "because there is no evidence that these conditions have more than a minimal limitation on [her] ability to perform work-related activities." (*Id.*).

At Step Three, the ALJ determined Ms. Dillard did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20-21). The ALJ examined and considered all listed impairments and specifically addressed Listings 1.15, 1.18, 1.22 (collectively, musculoskeletal disorders), 3.03 (asthma), 4.05 (recurrent arrhythmias), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders). (Tr. 21-23).

Before proceeding to Step Four, the ALJ reviewed the medical records, function reports, administrative hearing testimony, and medical opinions and determined Ms. Dillard has

> the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: The claimant can never climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl. The claimant is limited to standing or walking at one time to 30 minutes before she must be able to sit for 1-2 minutes. She can have occasional concentrated exposure to extreme cold, heat, humidity, and wetness as well as occasional exposure to concentrated levels of dust, fumes, odors, gases, poor ventilation, and other pulmonary irritants. She cannot work around unprotected heights, unprotected moving mechanical machinery, vibrations, or heavy machinery. She cannot operate heavy machinery or perform any commercial driving. The claimant can understand, remember, and carry out simple, routine, and repetitive tasks but not at a production rate pace such as required working on an assembly line. She can make judgments on simple work and respond appropriately to usual work situations where duties are generally predictable, stable, and are short cycle and handle occasional changes in a routine work setting that are explained in advance and implemented slowly. She cannot perform work that

17

requires a daily production quota, i.e., piecework, but can perform goal-oriented work and meet end of day production requirements that includes remaining on task for 2-hour segments of time. She cannot interact with the general public and can have occasional interaction with supervisors and coworkers and with coworkers, she cannot engage in team or tandem tasks or conflict resolution.

(Tr. 23). At Step Four, the ALJ determined Ms. Dillard is unable to perform any past relevant work. (Tr. 32). At Step Five, the ALJ concluded jobs exist in significant numbers in the national economy that Ms. Dillard can perform, including final assembler, circuit board assembler, and document preparer. (Tr. 33). Thus, the ALJ found Ms. Dillard was not disabled from April 3, 2018 through the date of the decision. (Tr. 34).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account

whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not

mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010)

DISCUSSION

Ms. Dillard brings three issues for this Court's review:

1.    The ALJ erred when she failed to discuss the opinions of the treating source and failed to incorporate the stated limitations into her RFC.

2.    The ALJ erred when she failed to properly evaluate Plaintiff's migraine headaches at Step Three of the Sequential Evaluation.

3.    The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of all Plaintiff's symptoms, including syncope and fatigue, precluded her from performing substantial gainful activity on a full-time and sustained basis.

(ECF #9, PageID 3278). As I explain below, Ms. Dillard's second argument is correct and warrants remand. Accordingly, because that issue alone is dispositive of Ms. Dillard's appeal, judicial economy compels me to omit analysis of her first and third arguments.

In her second argument, Ms. Dillard alleges the ALJ erred by not evaluating her migraines according to SSR 19-4p, which directs that primary headache disorders be evaluated under Listing 11.02. (*Id.* at PageID 3290). She asserts the ALJ found her migraine headaches a severe impairment, but only considered Listings 1.15, 1.18, 1.22, 3.03, 4.05, 12.04, and 12.06, and failed to mention SSR 19-4p in her Step Three evaluation. (*Id.*) (citing Tr. 20-22). She acknowledges that, during the RFC evaluation, the ALJ stated that Ms. Dillard's medication had reduced the severity of her migraines; even so, however, she was still having migraines several times per week. (ECF # 9, PageID 3291, citing Tr. 24). Despite positive results from treatment, Ms. Dillard argues she

20

satisfies the criteria of SSR 19-4p and equals Listing 11.02(B) based on her documented headaches. (ECF #9, PageID 3291).

The Commissioner opposes, arguing the ALJ considered the appropriate listings because "she stated that the record did not establish that [Ms. Dillard] had an impairment that 'medically meets or equals the severity requirements of any listed impairment.'" (ECF #11, PageID 3318, quoting Tr. 21). Moreover, the Commissioner states, the claimant bears the burden of proving disability at Step Three; as such, an ALJ need not discuss every listing, especially as here, where Ms. Dillard did not allege at the hearing that she met or equaled a particular listing. (ECF #11, PageID 3318) (citing *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)).

Based on my review of the record, I conclude substantial evidence does not support the Commissioner's assertion that the ALJ's catchall phrase demonstrates full consideration of relevant Listings. The cited passage, in full, states:

> While the claimant's impairments are severe, the record does not specifically establish that the claimant has an impairment that medically meets or equals the severity requirements of any listed impairment. The undersigned has examined and considered all listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, with specific attention to Listings 1.15, 1.18, 1.22, 3.03, and 4.05.

(Tr. 21). Notably, there is no mention of migraines or the relevant Ruling at any point during the Step Three evaluation. (*See* Tr. 21-23). Moreover, *Sheeks* is unpersuasive in this context.

SSR 19-4p provides guidance on how primary headache disorders are established and evaluated. The Ruling indicates that "[p]rimary headache disorder is not a listed impairment," but Listing 11.02 (epilepsy) "is the most closely analogous listed impairment for a [medically determinable impairment] of a primary headache disorder." SSR 19-4p, 2019 WL 4169635, at *7. In developing SSR 19-4p, the Social Security Administration referred to the third edition of the

International Classification of Headache Disorders (ICHD-3), which provides classification of headache disorders and diagnostic criteria for scientific, educational, and clinical use. *Id.* at *2. The ICHD-3 diagnostic criteria for migraine without aura include pain lasting 4 to 72 hours (untreated or unsuccessfully treated) and at least two of four characteristics (unilateral location, pulsating quality, moderate or severe pain intensity, or aggravation by or causing avoidance of routine physical activity). *Id.* at *5. Additionally, during the headache, the individual must experience at least one of the following: nausea, vomiting, photophobia, or phonophobia. *Id.* Regarding Listing 11.02, SSR 19-4p explains, in relevant part:

> While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her [medically determinable impairment](s) medically equals the listing.

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [accepted medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* at *7.

The relevant Social Security regulations require the ALJ to find a claimant disabled if that person meets a listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Yet, neither the listings nor the Sixth Circuit require the ALJ to "address

every listing" or "to discuss listings that the applicant clearly does not meet." *Sheeks,* 544 F. App'x at 641; *see also Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 507–08 (6th Cir. 2006) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that[ ] 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'") (quoting *Loral Defense Sys.-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir. 1999)). But the ALJ should discuss the relevant listing where the record raises "a substantial question as to whether [the claimant] could qualify as disabled" under a listing. *Abbott v. Sullivan,* 905 F.2d 918, 925 (6th Cir. 1990); *see also Sheeks,* 544 F. App'x at 641.

To raise a "substantial question" as to whether she has satisfied a listing, Ms. Dillard must do more than point to evidence on which the ALJ could have based her finding. *Sheeks,* 544 F. App'x at 641-42 (finding claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he meets a listing and where claimant pointed to only a few pieces of tenuous evidence addressing the listing). Rather, the claimant must point to specific evidence that demonstrates she reasonably could meet or equal every requirement of the listing. *See Sullivan,* 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of the criteria, no matter how severely, does not qualify."); *Foster v. Halter,* 279 F.3d 348, 354-55 (6th Cir. 2001) (claimant must satisfy the diagnostic description *and* one of the four sets of criteria); *see also Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x 411, 416 (6th Cir. 2011) (holding that it was not harmless error for the ALJ to fail to analyze Step Three as to an impairment found to be severe at Step Two where the

claimant put forth evidence that possibly could meet the relevant listing). Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

Although the ALJ considered Ms. Dillard's response to prescribed treatment in her Step Four analysis (*see* Tr. 24-26), there is no indication the ALJ fully considered the other criteria set forth in SSR 19-4p relevant to medical equivalence with Listing 11.02(B). And, as the applicable Ruling points out, the ALJ's focus should have been on records from the treating providers memorializing Ms. Dillard's statements regarding her migraine headaches, including the duration, intensity, and accompanying symptoms; frequency; adherence to treatment; and limitations associated with the disorder or effects of its treatment. *See* SSR 19-4p, at *7; *see also Jandt v. Saul*, No. 1:20-CV-00045-HBB, 2021 WL 467200, at *10 (W.D. Ky. Feb. 9, 2021). The ALJ does not explain how she considered these factors because her decision remains silent on whether Ms. Dillard's headaches medically equaled the severity and duration of Listing 11.02(B).

Ms. Dillard's brief details some of the relevant evidence is contained in the medical record, such as:

- migraines more than half the days per month and lasting more than four hours at a time;

- migraines that came and went but seemed to be lasting longer;

- daily headaches despite taking maintenance medication daily and receiving Aimovig shots monthly;

- worsening morning frontal headaches; and

- lightheadedness and dizziness.

(*See* ECF #9 at PageID 3290-91). My review of the medical record reflects additional evidence not fully considered by the ALJ. For example, Ms. Dillard's providers indicated her dizziness may be

24

related to vestibular migraine. (Tr. 1567). Even when her migraines improved, her dizziness did not. (Tr. 719). There were days she was bedridden with dizziness despite reduced frequency of her migraines. (*Id.*). And even while on a monthly Aimovig shot and other oral medications, she still had frequent headaches. (*See, e.g.*, Tr. 3152-53). These complaints continued into January 2022, just a few weeks prior to her hearing date. (Tr. 3244).

Without the ALJ's analysis of this and other relevant evidence in the record, I cannot tell whether she considered it and discounted it, overlooked it, or something else. The ALJ's failure to explain her consideration of Listing 11.02(B) or SSR 19-4p leaves this Court unable to conduct a meaningful review of whether substantial evidence supports her conclusions. It bears repeating that the "substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks*, 531 F. App'x at 641 (cleaned up).

Ms. Dillard has demonstrated that the record raises a substantial question about her ability to satisfy a listing. The evidence demonstrates she could reasonably show her primary headache disorder is equal in severity and duration to the criteria in Listing 11.02(B), including headaches and dizziness severe enough to require staying bedridden, avoiding movement that causes dizziness, and that occur at least once a week for at least three consecutive months despite adherence to prescribed treatment. Therefore, the ALJ's failure to consider whether Ms. Dillard's migraine headaches are medically equal to Listing 11.02(B) is not harmless.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **REVERSE** the Commissioner's decision denying disability

insurance benefits and supplemental security income and **REMAND** this matter for proceedings

consistent with this recommendation.

Dated: February 15, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge. *See* Fed. R.
Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly
asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation. *Berkshire v.
Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186,
2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at
509). The failure to assert specific objections may in rare cases be excused in the
interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th
Cir. 2019).